**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**



ANN MARIE REARDON,

        Plaintiff,

v.                            Civil Case No. 3:16-cv-34

MARK R. HERRING, in his Official
Capacity as Attorney General
of Virginia, <u>et al.</u>,

       · Defendants.

## MEMORANDUM OPINION

This matter is before the Court on DEFENDANTS' MOTION TO DISMISS (ECF No. 5).  For the reasons set forth below, the motion will be granted in part and denied in part.

## BACKGROUND

Plaintiff, Ann Marie Reardon, filed a Complaint ("Compl.," ECF No. 1) on January 15, 2016, alleging that Mark Herring ("Herring"), acting in his official capacity as Attorney General of Virginia, and the Office of the Attorney General ("OAG") (collectively, "Defendants") violated the Equal Pay Act of 1963 ("EPA").[1]  The factual allegations forming the bases for

---

[1] Both Herring and the OAG are named defendants, but the parties now agree that the OAG is not <u>sui juris</u> and thus cannot be sued. Hence, the OAG will be dismissed as a defendant.  Also, the OAG shall be removed from the style of the case, which henceforth will be <u>Ann Marie Reardon v. Mark R. Herring, in his official</u>

Reardon's claims are set out below as they are pleaded in the Complaint. All reasonable inferences are drawn in Reardon's favor.

Reardon was employed by the OAG from approximately December 23, 2010 through June 15, 2015 as an assistant Attorney General ("AAG"). (Compl. ¶ 11). Reardon was admitted to the Virginia State Bar as a licensed attorney in 1984, and practiced law from 1984 until 1988 and again from 2006 to the present. Id. ¶¶ 18-19. Thus, at the time Reardon was hired, she had been a member of the Virginia Bar for 26 years, but had only practiced law for eight years. Reardon's duties as an AAG included, but were not limited to:

- conducting criminal prosecutions on behalf of the Attorney General;
- conducting prosecutions of certain types of matters as a Special Assistant United States Attorney;
- creating and administering the REALITY project, the Attorney General's awareness campaign against prescription drug abuse;
- reviewing and making recommendations to the Attorney General on all requests to conduct criminal investigations of state and local elected officials;

capacity as Attorney General of Virginia. The Clerk will amend the style in the CM/ECF system and all pleadings filed hereafter shall bear the new style.

- providing advice and legal representation to the Departments of State Police, Criminal Justice Services, and Alcohol Beverage Control;

- providing legal guidance and prosecutorial assistance to the Department of Environmental Quality and local jurisdictions regarding environmental crimes committed in the Commonwealth of Virginia;

- reviewing public safety bills submitted to the General Assembly; drafting opinions for the OAG; and

- completing any other duties as assigned.

Id. ¶ 62.

During the term of Reardon's employment, the OAG used matrix guidelines to determine attorney classification and pay. Id. ¶ 22. In the matrix, the classification of attorneys is based on the number of years from the date of admission to the bar. Id. ¶ 24. When Reardon was hired in 2010, she was classified as an "AAG III," a category that typically includes attorneys who have been admitted to the bar for 10 to 15 years. Id. ¶ 25. The 2011 matrix guidelines set a salary range of $70,000.00 to $90,000.00 for attorneys classified as AAG III. Id. ¶ 27. Reardon's starting salary was $62,000.00. Id. ¶ 26.

Sometime in 2011, Reardon discovered that her annual salary was below the salary range for attorneys classified as AAG III, and brought the discrepancy to the attention of Patrick Dorgan

3

("Dorgan"), a Senior Assistant Attorney General. Id. ¶¶ 28-29. In response, Reardon's annual salary was increased in 2012 to $63,000.00. Id. ¶ 30.

In 2013, the OAG updated its matrix guidelines, and set the AAG III salary range at $71,400.00 to $91,800.00. Id. ¶¶ 31-32. On April 25, 2013, then-Attorney General Ken Cuccinelli ("Cuccinelli") notified Reardon of an increase in her annual salary to $64,000.00, in recognition of her excellent annual evaluation for the previous year. Id. ¶ 33.

In 2014, Reardon again complained that her salary was below the matrix guidelines, this time to Linda Bryant ("Bryant"), the Deputy Attorney General responsible for Reardon's section at the OAG. Id. ¶ 37. Reardon also raised the issue in her response to a questionnaire sent to all OAG attorneys in early 2014 requesting feedback regarding the OAG's policies and practices. Id. ¶¶ 35-36.

In "late 2014," Reardon mentioned to Dorgan and to Michael Jagels, who then was the supervisor of Reardon's section, that she was "paid below the matrix guidelines and/or other male attorneys at the OAG." Id. ¶ 39. At that time, Reardon's annual salary was approximately $65,280.00, well below the existing 2013 matrix guidelines for AAG IIIs. Id. ¶ 41. Reardon also complained "numerous times" in "early 2015" to

Jagels and Bryant about "being paid below the matrix guidelines and/or other male attorneys at the OAG." Id. ¶ 42.

In 2015, the OAG again issued updated matrix guidelines, which set the AAG III salary range at $90,800.00 to $136,200.00. Id. ¶ 43-44, 48.   On May 29, 2015, all OAG attorneys were provided additional details about the new guidelines. Id. ¶ 45. The e-mail stated, in part, "the amount by which your salary falls under the new minimum for your classification (if it falls under the new minimum at all) represents the amount of the OAG-sponsored pay adjustment any individual attorney will receive in September." Id. ¶ 46 (emphasis in original).

Less than three weeks after announcing the 2015 matrix guidelines, Reardon was informed that her employment was terminated.   Id. ¶ 67.   At that time, Reardon's salary was still "far below" the minimum salary for the AAG III classification. Id. ¶ 49.

There were six attorneys in Reardon's section in 2015, including Reardon; the other five attorneys were all male.   Id. ¶¶ 50-51.   The Complaint alleges that the five male attorneys had between 13 and 21 years of bar experience,[2] and that they

---

[2] The Complaint does not allege the specific year that each of the male attorneys in Reardon's section was admitted to the practice of law; rather, the Complaint states only that each attorney "has" a certain number of years of bar experience, ranging from 13 to 21 years.   (Compl. ¶¶ 53-57).   Therefore, it is difficult to discern whether these numbers are current as of

received salaries ranging from $76,584.00 to $95,000.00 in 2014. Id. ¶¶ 53-57. All five male attorneys were also classified as AAG IIIs, and their responsibilities were similar to Reardon's. Id. ¶¶ 53-57, 63. Thus, in 2014, Reardon's annual salary was $11,304.00 less than the lowest paid male AAG III attorney in Reardon's section. Id. ¶ 59.

Reardon asserts two claims based on the foregoing allegations. In Count I, Reardon asserts that the discrepancy between her salary and the salaries of the male attorneys in her section was the result of gender discrimination in violation of the EPA. Id. ¶¶ 69-77. In Count II, Reardon asserts that the termination of her employment constitutes unlawful retaliation that was caused by her complaints to supervisors concerning her salary. Id. ¶¶ 78-83.

Herring and the OAG filed a motion to dismiss (ECF No. 5) the case for several reasons. First, the motion alleges a lack of subject matter jurisdiction and thus seeks dismissal under Fed. R. Civ. P. 12(b)(1). (Defendants' Memorandum of Law in Support of Motion to Dismiss ("Def. Mem.," ECF No. 6) at 5). The motion asserts that the EPA does not apply to Reardon

---

the filing of the Complaint, or if the numbers refer to the attorneys' years of bar experience as calculated from 2015, 2014, or the dates that they were hired. For purposes of this Memorandum Opinion, the Court assumes that the male attorneys' years of bar experience, as alleged in the Complaint, were calculated from 2015, when the relevant adverse action occurred.

because she was an appointee "on the policy-making level," and therefore not an "employee" within the meaning of the EPA. Defendants' motion takes the position that Reardon's employee status is an issue of standing, and therefore jurisdictional. Id.

The Supreme Court has held that a defendant's status as an "employer" within the meaning of federal employment discrimination laws is a substantive issue, rather than a jurisdictional one. Arbaugh v. Y & H Corp., 546 U.S. 500 (2006). The Court explained that, "when Congress does not rank a statutory limitation on coverage as jurisdictional, courts should treat the restriction as nonjurisdictional in character." Id. at 516. The Supreme Court has not yet addressed whether the same principle governs a plaintiff's status as an "employee"; however, since Arbaugh, lower courts have consistently held that a plaintiff's status as an "employee" within the meaning of federal employment discrimination laws is typically better suited for resolution under Fed. R. Civ. P. 12(b)(6), rather than Rule 12(b)(1), because the plaintiff's employee status is "intertwined with the facts that are central to the merits of the dispute" and implicates an element of the plaintiff's prima facie case. See, e.g., Xie v. Univ. of Utah, 243 F. App'x 367, 371 (10th Cir. 2007); Price v. Waste Mgmt., Inc., 2014 WL 1764722, at *5 (D. Md. Apr. 30, 2014); German v. Akal Sec.,

7

Inc., 2011 WL 5974619, at *8 n.14 (D. Md. Nov. 29, 2011); U.S. ex rel. Suh v. HCA-The Healthcare Co., 2009 WL 1834586, at *3 (E.D.N.C. June 23, 2009). Accordingly, to the extent that the motion to dismiss is brought under Rule 12(b)(1), it will be denied. However, the "employee" issue remains susceptible to resolution under Rule 12(b)(6).

The motion also seeks dismissal under Fed. R. Civ. P. 12(b)(2) for lack of personal jurisdiction because the OAG is not sui juris and thus may not be sued as an entity. Reardon agrees. Thus, to the extent that the motion is based on Rule 12(b)(2), it will be granted upon the agreement of the parties.

Lastly, the motion seeks dismissal under Fed. R. Civ. P. 12(b)(6) because Reardon has not adequately alleged a claim for either discrimination (Count I) or retaliation (Count II) under the EPA. (Def. Mem. at 14-22).

## DISCUSSION

### A. Legal Standard: Fed. R. Civ. P. 12(b)(6)

Fed. R. Civ. P. 12(b)(6) permits a party to move for dismissal of a claim if the complaint fails "to state a claim upon which relief can be granted." Fed. R. Civ. P. 8(a)(2) requires "a short and plain statement of the claim" showing that the pleader is entitled to relief. "To survive a motion to dismiss, a complaint must contain sufficient factual matter,

accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).

Courts should assume the veracity of all well-pleaded allegations in the Complaint, and should deny a motion to dismiss where those well-pleaded allegations state a plausible claim for relief. Id. at 679. A claim is "plausible" when the plaintiff pleads facts sufficient to allow the court to draw the reasonable inference that the defendant is liable for the alleged misconduct. Twombly, 550 U.S. at 556. The court should grant a motion to dismiss, however, where the allegations are nothing more than legal conclusions, or where they permit a court to infer no more than a possibility of misconduct. Iqbal, 556 U.S. at 678-79.

Although courts generally do not consider extrinsic evidence in deciding motions under Rule 12(b)(6), "a court may consider...documents central to a plaintiff's claim, and documents sufficiently referred to in the complaint without converting the [motion] into one for summary judgment, so long as the authenticity of the documents is not disputed." PBM Nutritionals, LLC v. Dornoch Ltd., 667 F. Supp. 2d 621, 626 (E.D. Va. 2009) (citing Witthohn v. Fed. Ins. Co., 164 F. App'x 396, 396 (4th Cir. 2006)).

## B. Reardon is Not Exempt from the Protections of the EPA: Counts I and II

To bring a claim under the EPA, a plaintiff must be an "employee" as that term is defined by the Fair Labor Standards Act ("FLSA").[3]   29 U.S.C. § 216(b); Dellinger v. Sci. Applications Int'l Corp., 649 F.3d 226, 229 (4th Cir. 2011). Herring seeks dismissal of Counts I and II because, in his view, Reardon's position is excepted from the FLSA's definition of employee.

The FLSA's definition of employee includes "any individual employed by an employer[,]" 29 U.S.C. § 203(e)(1), except that certain state and local government workers are not within the ambit of the statute. Specifically, the term "employee" does not include any individual employed by a state, political subdivision of a state, or an interstate governmental agency:

(i)     who is not subject to the civil service laws of the State, political subdivision, or agency which employs him; and

(ii)    who—

    (I)     holds a public elective office of that State, political subdivision, or agency,

    (II)    is selected by the holder of such office to be a member of his personal staff,

---

[3] See, e.g., Pinkett v. Apex Commc'ns Corp., 2009 WL 1097531, at *10 (E.D. Va. Apr. 21, 2009) (noting that "the EPA is part of the Fair Labor Standards Act of 1938 ('FLSA') and employs the FLSA's enforcement scheme").

10

(III)   is appointed by such an officeholder to serve on a policymaking level,

(IV)   is an immediate adviser to such an officeholder with respect to the constitutional or legal powers of his office, or

(V)    is an employee in the legislative branch or legislative body of that State, political subdivision, or agency and is not employed by the legislative library of such State, political subdivision, or agency.

29 U.S.C. § 203(e)(2)(C).

Herring contends that Reardon does not qualify as an "employee" under the FLSA because she was not subject to the civil service laws of Virginia in her role as an AAG III and was "appointed by [an elected] officeholder to serve on a policymaking level." (Def. Mem. at 7-14). Specifically, Herring asserts that Reardon was "appointed to serve...on a policymaking level" because she "enjoyed a broad scope of responsibilities that shared one commonality--they had the potential to shape the policy of the Commonwealth." (Def. Mem. at 13).

Reardon concedes that she was appointed by the Attorney General, an elected official, and was not subject to civil service laws in her role as an AAG. (Pl. Mem. at 11). Therefore, the dispositive question is whether Reardon "was appointed...to serve on a policymaking level."

### 1. **Undisputed Principles**

Although the parties are at odds over the meaning of the statutory terms and the applicable controlling legal authority, they are in agreement on certain principles. First, they agree that whether an appointee falls within this exception to the EPA's coverage is a question that is controlled by "federal law, with state law relevant only insofar as it describes the plaintiff's position, including his duties and the manner in which he is hired, supervised, and fired." United States v. Gregory, 818 F.2d 1114, 1116 (4th Cir. 1987). Second, they agree that, in making this determination, courts must "focus principally on the responsibilities and powers inherent in the position, rather than on the actions of specific individuals, including plaintiffs, who hold or have held the position." Kelley v. City of Albuquerque, 542 F.3d 802, 810 (10th Cir. 2008); see also Butler v. New York State Dept. of Law, 211 F.3d 739, 749 (2d Cir. 2000) (the court must "look at the attributes of the position, not the actual performance of the job, to determine whether the employee was a...high policymaker"). Third, they agree that "an individual's status as a policy-making employee frequently poses a fact question...However, when the duties and responsibilities of a particular position are clearly defined by law and regulations, a court may resolve this issue without the aid of a finder of fact." Vargas-

12

Harrison v. Racine Unified Sch. Dist., 272 F.3d 964, 972 (7th
Cir. 2001) (internal citations omitted).  Finally, they do not
dispute that the EPA's "broadly remedial" purposes provide the
backdrop for this analysis.  Corning Glass Works v. Brennan,
417 U.S. 188, 208 (1974).

### 2. Statutory Text

The statute excepts from the definition of an "employee"
individuals "appointed...to serve on a policymaking level."  29
U.S.C. § 203(e)(2)(C).  However, the statute does not define
term "policymaking level."  Thus, under standard principles of
statutory interpretation, "absent explicit legislative intent to
the contrary," the term "policymaking level" is to be given its
"plain and ordinary meaning."  Broughman v. Carver, 624 F.3d
670, 675 (4th Cir. 2010) (quoting Carbon Fuel Co. v. USX Corp.,
100 F.3d 1124, 1133 (4th Cir. 1996) (internal quotation marks
omitted).  According to the Oxford English Dictionary, the
compound word "policymaking" has two similar meanings.  As a
noun, policymaking means "the devising of policies, esp. by a
government or political party."  Oxford English Dictionary,
http://www.oed.com/view/Entry/146842?redirectedFrom=policymaking
#eid29476759 (last visited May 23, 2016).  As an adjective,
"policymaking" means "that makes or is associated with the
making of policy."  Id.  Dictionary.com defines "policymaker" as
"a person responsible for making policy, especially in

13

government." Dictionary.com, http://www.dictionary.com (last visited May 23, 2016).

Because both definitions are driven by the word "policy," the Court must also examine the meaning of that word. The Oxford Dictionary defines policy to mean "[s]enses related to public or politic practice." Oxford English Dictionary, http://www.oed.com/view/Entry/146842?rskey=gHUTDe&result=1#eid (last visited May 23, 2016). Dictionary.com defines "policy" to be "a course of action adopted and pursued by a government, ruler, political party, etc." Dictionary.com, http://www.dictionary.com (last visited May 23, 2016).

And, because the positional reference in the statute is defined as a "level" (modified by the adjective "policymaking"), the Court must examine the term "level." The word "level" is defined as "[a] plane or status in respect of rank or authority; position in a hierarchy." Oxford English Dictionary, http://www.oed.com/view/Entry/107653?rskey=MMzKSq&result=1#eid (last visited May 23, 2016). The word is frequently used with a qualifying adjective. Id. That is the case when the adjectival form of "policymaking" precedes the word "level."

These words, given their usual meaning, teach that one "appointed...to serve at a policymaking level" is of a rank or position in government to make or devise, or to assist in the making or devising of, a course of action that is adopted or

14

pursued by a government. In sum, the common usage of the term "policymaking level" refers to high level officials who play an active role in formulating or implementing governmental objectives. However, the decisional law has not found that the statutory words, accorded their usual meaning, are sufficiently clear to be the dispositive predicate for applying the term "policymaking level" to particular positions.

If this issue had to be resolved on a clean slate, the Court would conclude that the words of the statute, given their usual meaning, provide a sufficiently clear textual basis for decision. However, courts have not been so persuaded.

### 3. **Legislative History**

Because courts have not generally regarded the plain meaning of the statutory language as dispositive, it is appropriate to examine the legislative history for what guidance it may give respecting Congress' intent. See, e.g., Black & Decker Corp. v. United States, 436 F.3d 431, 436 (4th Cir. 2006) (citing Yi v. Fed. Bureau of Prisons, 412 F.3d 526, 533 (4th Cir. 2005)). Though there is little legislative history concerning § 203(e)(2)(C), the amendment that added identical language to Title VII generated considerable debate. Because there is no legislative history concerning the definition of "employee" in the FLSA, and because the identical language in Title VII is accompanied by extensive legislative history,

15

courts frequently "accord substantial weight to the legislative history of the cognate Title VII provision in construing [§ 203(e)(2)(C)]." Gregory v. Ashcroft, 501 U.S. 452, 489 (1991) (Blackmun, J., dissenting); see also Marburger v. Upper Hanover Twp., 225 F. Supp. 2d 503, 512 (E.D. Pa. 2002).

When Congress decided to amend Title VII to include states and local governments as employers, the original bill did not contain any employee exclusion.  The absence of such a provision troubled Senator Ervin, who repeatedly expressed his concern that the (unamended) definition of "employee" would be construed to reach those "persons who exercise the legislative, executive, and judicial powers of the States and political subdivisions of the States" and their advisers, and thereby give federal courts undue power over states' self-governance.  118 Cong. Rec. 1838 (1972).  Section 701(f) of Title VII, which was later incorporated into the FLSA as § 203(e)(2)(C), was directed at addressing this concern.

In discussing the "policymaking level" exception, the conference managers' report emphasizes that it "is the intention of the conferees to exempt elected officials...and persons appointed by such elected officials as advisors or to policymaking positions at the highest levels of the departments or agencies of State or local governments, such as cabinet officers, and persons with comparable responsibilities at the

local level." JOINT EXPLANATORY STATEMENT OF MANAGERS AT THE CONFERENCE ON H.R. 1746, 92nd Cong. 2d Sess., reprinted in 1972 U.S. Code Cong. & Admin. News ("USCCAN") 2137, 2179, 2180 ("Joint Explanatory Statement") (emphasis added). Similarly, the House-Senate Conference Committee, which developed the final language found in Title VII, stated specifically that the amendment exempts only

> appointees of [elected] officials on the highest policymaking levels such as cabinet members or other immediate advisors of such elected officials...This exemption is intended to be construed very narrowly and is in no way intended to establish an overall narrowing of the expanded coverage of State and local governmental employees as set forth in section 701(a) and (b) above.

SECTION-BY-SECTION ANALYSIS OF H.R. 1746, S. REP. 681, at 2 (emphasis added). This legislative history could not be clearer: Congress intended that the exception be very narrowly construed, and that the exception should apply only to officials "at the highest levels" of their respective departments.

### 4. Decisional Law

That clarity of legislative history notwithstanding, decisional law, rather than legislative history, represents the principal source of instruction as to the meaning of the term "policymaking level." The decisional law manifests a rather significant circuit split respecting the appropriate standard for determining whether an appointee serves "on the policymaking

level" and how that standard should be applied. There are three principal lines of authority.

Before turning to the three approaches, it is appropriate to note that the exemptions found at 29 U.S.C. § 203(e)(2)(C) are "essentially identical" to the exemptions to the definition of "employee" found in Title VII of the Civil Rights Act of 1964. Brewster v. Barnes, 788 F.2d 985, 990 n.7 (4th Cir. 1986). The Age Discrimination in Employment Act ("ADEA") also contains identical language. E.E.O.C. v. Sidley Austin Brown & Wood, 315 F.3d 696, 708 (7th Cir. 2002) (Easterbrook, J., concurring) (noting that this definition of "employee" is "a definition in wide use. Language essentially identical to [§ 203(e)(2)(C)] appears in [the ADEA and five other statutes]," such that "a definition may be secured from opinions that have addressed these other statutes."). This statutory kinshift is widely acknowledged. Therefore, the analysis of the term "employee" in § 203(e)(2)(C) of the EPA is informed by ADEA and Title VII jurisprudence in addition to decisional law interpreting the EPA.

### a. The Three Differing Approaches

The Seventh Circuit, in assessing identical statutory text in Title VII[4] and the ADEA,[5] has interpreted the relevant

---

[4] 42 U.S.C. § 2000e(f).

exception broadly to include any position that "authorizes, either directly or indirectly, meaningful input into governmental decision-making on issues where there is room for principled disagreement on goals or their implementation." Americanos v. Carter, 74 F.3d 138, 141 (7th Cir. 1996). The Seventh Circuit's construction of the statutory exclusion is based on that Circuit's interpretation of the First Amendment decisions in Elrod v. Burns, 427 U.S. 347 (1976) and augmented in Branti v. Finkel, 445 U.S. 507 (1980) ("the Elrod-Branti exception"). Herring urges this approach.

The Second Circuit, on the other hand, has held that the exception applies "only to such appointees as would normally work closely with and be accountable to the official who appointed them." Butler, 211 F.3d at 747. The Second Circuit's focus on proximity between the plaintiff's position and that of the elected official is echoed by the Tenth Circuit, which emphasizes that the exception requires "an immediate and personal relationship" between the appointee and elected official. Anderson v. City of Albuquerque, 690 F.2d 796, 801 (10th Cir. 1982). This approach is pressed by Reardon.

The parties have largely ignored an intermediate approach, articulated by the Eighth Circuit. Under that formulation, the "policymaking level" inquiry turns on the extent to which the

---

[5] 29 U.S.C. § 630(f).

plaintiff's position is "entrusted with extensive decisionmaking authority and discretionary power[.]" Gregory v. Ashcroft, 898 F.2d 598, 603 (8th Cir. 1990), aff'd, 501 U.S. 452 (1991); see also Brown v. Polk Cty., Iowa, 811 F. Supp. 432, 437 (S.D. Iowa 1992) (holding that a director of county information services department was not a "policymaker" because his "responsibilities, though supervisory in nature, were more administrative than discretionary" and "any ultimate decision making on important, policy initiatives" was left to plaintiff's superiors).[6]

The Eighth Circuit has offered a non-exhaustive list of factors to be considered in determining whether an appointee is "on the policymaking level," including:  "(1) whether the [appointee] has discretionary, rather than solely administrative powers, (2) whether the [appointee] serves at the pleasure of the appointing authority, and (3) whether the [appointee] formulates policy." Gregory, 898 F.2d at 604 (quoting Stillians v. Iowa, 843 F.2d 276, 278-79 (8th Cir. 1988), abrogated on other grounds, Astoria Fed. Sav. & Loan Ass'n v. Solimino, 501 U.S. 104 (1991) (alterations in original; internal citations omitted)).

---

[6] It appears that no other Court of Appeals has developed a comprehensive framework for addressing this issue.  Indeed, the Third, Fifth, and Ninth Circuits, like the Fourth Circuit, have not yet offered any guidance on the meaning of this exception.

### b. The Appropriate Standard

In construing the identical exception under the ADEA, the First Circuit aptly explained that the task in applying the exception is to strike the best "balance between the protection of employees from [wage] discrimination, and the protection of a state's--and its people's--ability to independently govern itself." E.E.O.C. v. Massachusetts, 858 F.2d 52, 56-57 (1st Cir. 1988). For several reasons, the Eighth Circuit's test best achieves that objective.

First, the Eighth Circuit's approach is consistent with the ordinary meaning of the statutory text and follows logically from the plain language of the statute, by examining not whether an appointee is a policymaker, but rather, whether an appointee is "on the policymaking level." 29 U.S.C. § 203(e)(2)(C). Under this framework, whether an appointee actually "makes policy" is a factor to be considered, but the fact that an appointee does not "make policy" in the traditional sense is not dispositive.

Second, although the Eighth Circuit declined to rely on legislative history in formulating its approach, its common-sense focus on the appointee's decision-making authority and whether the appointee's position is one that actually influences formulation of policy necessarily guides courts toward results that stay true to the clear and well-documented congressional

21

intent that the exception be very narrowly construed. And, statutes are to be interpreted to affect the intent of Congress where that can be constitutionally accomplished. See, e.g., Broughman, 624 F.3d at 674.

Third, the Eighth Circuit's test is flexible and appropriately sensitive to the fact-specific nature of this inquiry, without leading to conflation with, or consumption of, either of the surrounding statutory exceptions, which exempt an elected official's personal staff and immediate legal advisers from the coverage of the EPA.

Finally, and perhaps most importantly, the approach adopted by the Eighth Circuit does not suffer from the flaws of the approaches taken by the Second and Seventh Circuits, as urged by Reardon and Herring, respectively.[7]  The Court declines to adopt either of those approaches, for the reasons set forth below.

---

[7] Because the Court declines to subscribe to the Seventh Circuit's approach to this issue, the Court necessarily cannot follow the decision in Stokes v. Benham, 2015 WL 4139274 (E.D. Va. July 8, 2015), which is of persuasive, but not precedential, effect. See Camreta v. Greene, 131 S. Ct. 2020, 2033 n.7 (2011) ("A decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case.") (citing 18 J. Moore et al., Moore's Federal Practice § 134.02[1][d] (3d ed. 2011)).

### i. The Problems with the Seventh Circuit's Approach

To begin, the sweeping approach taken by the Seventh Circuit is antithetical to the narrow construction of the exception that Congress intended. Congress quite clearly specified that those excepted from the reach of the definition of "employee" were to be the people who were appointed by an elected official to serve "on a policymaking level." These were described as positions at the highest levels of government. As noted above, the conference managers' Joint Explanatory Statement and the House-Senate Conference Committee both emphasized that the amendment exempts only

> appointees of [elected] officials on the highest policymaking levels such as cabinet members or other immediate advisors of such elected officials...This exemption is intended to be construed very narrowly and is in no way intended to establish an overall narrowing of the expanded coverage of State and local governmental employees as set forth in section 701(a) and (b) above.

SECTION-BY-SECTION ANALYSIS OF H.R. 1746, S. REP. 681, at 2 (emphasis added). This well-documented congressional intent has also been repeatedly echoed by the EEOC. See, e.g., EEOC Decision No. 78-42, September 29, 1978; EEOC Decision No. 79-8, October 20, 1978.

The Seventh Circuit's view that this level includes all those who have meaningful input, "directly or indirectly," into

23

government decision making is so broad as to include, for example, probation officers;[8] health inspectors;[9] and any staff member who provides research or writes a position paper that ultimately finds its way, in whole or in part, into a government's decisional process. In any government, that could include hundreds of appointees, thereby broadening the exception so much as to render the EPA's applicability to state and local government employers of little efficacy, thereby frustrating the intent of Congress.

Second, the Elrod-Branti analysis used by the Seventh Circuit can be transposed only imperfectly onto the framework of the policymaking level exception. Although the two doctrines stem from similar concerns, and the analyses may often overlap, they are not interchangeable because the purpose of the Elrod-Branti exception is fundamentally different than the purpose of the statutory exception. The Elrod-Branti exception rests on the recognition that there are some governmental positions for which political ideology is a relevant job requirement, and attempts to balance that recognition against the constitutional right of association. The policymaking level exclusion, on the other hand, reflects Congress' recognition that state leaders

---

[8] O'Reilly v. Newman, 2003 WL 23101795, at *10 (S.D. Ind. Feb. 24, 2003).

[9] Heck v. City of Freeport, 985 F.2d 305 (7th Cir. 1993).

24

ought to be free to choose their top level advisors without judicial interruption.[10]

To understand that distinction, it is necessary here to pause and examine the Elrod-Branti doctrine that serves as the predicate for the Seventh Circuit's approach to interpreting the "policymaking level" exception. The seed of the Elrod-Branti doctrine was the Supreme Court's recognition that political patronage has long been a prominent feature of our democratic system, and therefore, "party affiliation may be an acceptable requirement for some types of government employment." Branti, 445 U.S. at 517.

In the plurality opinion in Elrod, the Court found that that citizens' interest in political freedom was best served by "limiting patronage dismissals to policymaking positions." Elrod, 427 U.S. at 372. The plurality struggled to provide a clear definition of "policymaking positions," but noted that "[a]n employee with responsibilities that are not well defined or are of broad scope more likely functions in a policymaking position." Id. at 368.

Four years later, however, the Supreme Court charted a decidedly modified course in Branti. The Elrod plurality,

---

[10] It is also worth noting that Congress could not have meant to incorporate the rule in Elrod and Branti, decided in 1976 and 1980, respectively, into the policymaking level exception, which was added to Title VII in 1972.

joined by Justice Stevens and Chief Justice Burger, began by reaffirming the ultimate concern animating both the plurality and the concurrence in the previous case: "if an employee's private political beliefs would interfere with the discharge of his public duties, his First Amendment rights may be required to yield to the State's vital interest in maintaining governmental efficiency and effectiveness." Branti, 445 U.S. at 517. The Court then clarified that the key inquiry in political patronage First Amendment cases is not simply "whether the label 'policymaker' or 'confidential' fits a particular person," but rather, "whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." Id. at 518.

By way of example, the Court observed that, "if a State's election laws require that precincts be supervised by two election judges of different parties, a Republican judge could be legitimately discharged solely for changing his party registration." Id. On the other hand, "the Governor of a State may appropriately believe that the official duties of various assistants who help him write speeches, explain his views to the press, or communicate with the legislature cannot be performed effectively unless those persons share his political beliefs and party commitments." Id. Accordingly, the Court cautioned that, "[u]nder some circumstances, a position may be appropriately

considered political even though it is neither confidential nor policymaking in character." Id.

The Fourth Circuit has distilled the holding in Branti into a two-part test:  first, courts must make a "threshold inquiry" into whether "the position at issue, no matter how policy-influencing or confidential it may be, relates to 'partisan political interests...[or] concerns.'"[11]  Stott v. Haworth, 916 F.2d 134, 141 (4th Cir. 1990) (quoting Jiminez Fuentes v. Torres Gaztambide, 807 F.2d 236, 241-42 (1st Cir. 1986) (en banc), cert. denied, 481 U.S. 1014 (1987) (quoting Branti, 445 U.S. at 519)).  If this first inquiry is satisfied, courts must then "examine the particular responsibilities of the position to determine whether it resembles a policymaker, a privy to confidential information, a communicator, or some other office holder whose function is such that party affiliation is an equally appropriate requirement." Id. at 142.

With this background in mind, it is easy to see that the "policymaking level" exception is founded on some of the same concerns as the Elrod-Branti line of cases:  elected officials, in working to achieve their policy goals, are "likely to prefer

---

[11] Herring has not argued that Reardon's position as an AAG III "relates to partisan political interests."  And, there are no allegations in the Complaint from which the Court could infer that that is so.  Thus, even if Stott supplied the applicable test here (which it does not), Herring has not demonstrated that Reardon fits within the Elrod-Branti exception as a matter of law.

27

individuals with similar political and ideological outlooks."
EEOC Decision No. 78-42, September 29, 1978. Accordingly, both
Branti and § 203(e)(2)(C) evince an intent "to allow elected
officials the freedom to appoint those with whom they feel they
can work best." Id. It is no surprise, then, that courts may
frequently--but not always--reach the same result concerning the
plaintiff's entitlement to either statutory or constitutional
protection, as the case may be, under the Eighth Circuit's
"policymaking level" test and the Elrod-Branti test.

Importantly, however, the Supreme Court's holding in Branti
makes clear that the inquiry in political patronage cases is
necessarily broader than whether a position is that of a
"policymaker" or even whether the position is "on the
policymaking level." 445 U.S. at 518. Indeed, the Supreme
Court explicitly rejected the position that the political
patronage analysis could be simplified in that manner. As a
result, in conducting the Elrod-Branti analysis, courts need not
make fine distinctions between "policymakers," "advisers," and
"personal staff"; in fact, a plaintiff who fails to fall into
any of those categories may nonetheless be exempt from First
Amendment protection under Branti because, to trigger the
exemption, a defendant need only prove that the plaintiff's
position "potentially implicate[s] political considerations,"
regardless of "the appropriateness of semantic labels."

_Vanterpool v. Cuccinelli_, 998 F. Supp. 2d 451, 462 (E.D. Va. 2014). As the examples given by the Supreme Court effectively demonstrate, a position that is subject to dismissal on the basis of political affiliation under the _Elrod-Branti_ doctrine may, or may not, fit into any of the statutory exceptions found in § 203(e)(2)(C)(ii) and its Title VII or ADEA counterparts.

By contrast, the legislative history of the amendment that added the policymaking exception to Title VII, _see_ Part B.3 above, makes abundantly clear that Congress intended the policymaking level exception to be very narrowly construed. In sum, as the United States Court of Appeals for the First Circuit has explained,

> the narrow construction mentioned by the conferees...is clearly intended to limit the reach of the exception down the chain of command, and not so much across agencies or departments. This is evident from the very language of the conferees, who placed no restrictions on the number of agencies or departments covered, but limited the positions covered to those at the highest levels.

_E.E.O.C. v. Massachusetts_, 858 F.2d at 56.

Accordingly, the "broad remedial purposes" of the FLSA demand that courts determine with precision the specific statutory exception into which an appointee falls. Thus, it is important to recognize that the set of government officials who are appointees "on a policymaking level" contains only a small

29

cross-section of the larger group of government employees for whom political affiliation may be a suitable job requirement.

Third, and relatedly, the Seventh Circuit's failure to recognize this distinction has led to results that directly contradict the holdings of the political patronage cases upon which it draws to interpret that "employee" exception. As the Eleventh Circuit put it, the Seventh Circuit's failure to recognize this crucial distinction "has led to results far afield from Branti" that "appear[] to lie in sharp contrast to the facts of Branti itself." Cutcliffe v. Cochran, 117 F.3d 1353, 1358 n.4 (11th Cir. 1997). One commentator aptly summarized this problem:

> The disconnect is manifest: the Elrod plurality declined to deem a chief deputy sheriff a policymaker in a political discrimination claim [as have the Third, Fourth, Fifth, and Tenth Circuits]. Yet the Seventh Circuit has twice applied Elrod to reach the opposite conclusion in political patronage cases: holding as a matter of law that deputy sheriffs were policymakers and thus unprotected. The Circuit's reasoning that patronage caselaw directs its statutory construction is especially awkward given the U.S. Supreme Court's direction against reliance on a strict "policymaking" label in patronage cases...Notably, Branti dissenters lamented their prediction that the majority's holding would mean that assistant government attorneys would not be exempt from the patronage ban. Yet the Seventh Circuit recently relied on its reading of Elrod and Branti to justify deeming all Illinois assistant attorneys as policymaking-level appointees, and therefore

excluded from workers' rights protections [in Opp v. Office of State's Attorney of Cook Cty., 630 F.3d 616, 621 (7th Cir. 2010)].

Angela Galloway, Comment, A "Narrow Exception" Run Amok: How Courts Have Misconstrued Employee-Rights Laws' Exclusion of "Policymaking Appointees, and a Proposed Framework for Getting Back on Track, 86 WASH. L. REV. 875, 895-96 (2011) (footnotes omitted).

For the foregoing reasons, the Seventh Circuit's broad approach, which categorically exempts hundreds of lower-level government employees from the protections of employment discrimination laws, is at odds with the statutory text of the employee exception and is contrary to clear and well-documented congressional intent to limit this exception to employees "at the highest policymaking levels" of their respective departments. Moreover, that approach diverges sharply from the very cases on which it purports to be based.[12] Therefore, the Court declines to follow the approach adopted by the Seventh Circuit and urged by Herring.

---

[12] The Court does not mean to imply that the Elrod-Branti doctrine, as set forth by the Fourth Circuit in Stott, should be categorically ignored in determining whether an appointee is "on the policymaking level." The parallels between these analyses mean that, in some cases, jurisprudence interpreting Elrod, Branti, and Stott may be instructive. The Court emphasizes the distinctions between the two doctrines only to demonstrate why the Elrod-Branti test cannot be universally substituted for an analysis properly derived from the language and intent of the statutory exception at issue in this case.

### ii. The Problem With The Second/Tenth Circuits' Approach

The narrower construction, urged by Reardon and employed by the Second Circuit, is also problematic. The Second Circuit's focus on the relationship between the appointee and the elected official conflates the distinction between an elected official's "personal staff" or "immediate advisers" on the one hand, and on the other, "appointees on the policymaking level," thereby rendering those exemptions redundant. This reading of the exception is thus "at odds with one of the most basic of interpretative canons, that '[a] statute should be constructed so that effect is given to all of its provisions, so that no part will be inoperative or superfluous, void or insignificant.'" Corley v. United States, 556 U.S. 303, 314 (2009) (quoting Hibbs v. Winn, 542 U.S. 88, 101 (2004) (internal quotation marks omitted)).

This redundancy is a direct result of the erroneous application of another canon of interpretation, noscitur a sociis, which reminds us that "a word may be known by the company it keeps[.]" Russell Motor Car Co. v. United States, 261 U.S. 514, 519 (1923). In arriving at its definition of "policymaking level," the Second Circuit focused on the fact that "the first and third categories [of exempt employees], i.e., the elected official's personal staff and his immediate

advisors, refer to persons who would work closely with the elected official, and we would infer that the middle category was intended to share basic characteristics of the categories that surrounded it." E.E.O.C. v. State of Vermont, 904 F.2d 794, 798 (2d Cir. 1990), overruled in part by Gregory, 501 U.S. 452 (1991). However, as Justice White persuasively noted in his partial concurrence in Gregory, this reasoning is flawed:

> Petitioners argue that the "appointee[s] on the policymaking level" exception should be construed to apply "only to persons who advise or work closely with the elected official that chose the appointee."...In support of that claim, petitioners point out that the exception is "sandwiched" between the "personal staff" and "immediate adviser" exceptions in § 630(f) [of the ADEA], and thus should be read as covering only similar employees.
>
> Petitioners' premise, however, does not prove their conclusion. It is true that the placement of the "appointee" exception between the "personal staff" and "immediate adviser" exceptions suggests a similarity among the three. But the most obvious similarity is simply that each of the three sets of employees are connected in some way with elected officials: The first and third sets have a certain working relationship with elected officials, while the second is appointed by elected officials. There is no textual support for concluding that the second set must also have a close working relationship with elected officials. Indeed, such a reading would tend to make the "appointee" exception superfluous since the "personal staff" and "immediate adviser" exceptions would seem to cover most appointees who are in a close working relationship with elected officials.

33

Gregory, 501 U.S. at 483 (White, J., concurring in part and concurring in the judgment). That logic is persuasive. Accordingly and for the reasons set forth above, the Court declines to adopt the construction urged by Reardon.

### c. Application of the Eighth Circuit Standard

Having determined that the Eighth Circuit's approach supplies the applicable guidance, it is now necessary to examine whether Reardon's position, AAG III in the Major Crimes and Emerging Threats section of the OAG, was one that was "entrusted with extensive decisionmaking authority and discretionary power[.]" Gregory, 898 F.2d at 603. This determination is made by examining: "(1) whether the [appointee] has discretionary, rather than solely administrative powers, (2) whether the [appointee] serves at the pleasure of the appointing authority, and (3) whether the [appointee] formulates policy." Id. at 604 (quoting Stillians, 843 F.2d at 278-79). This list of factors is not exhaustive, and not all of the factors will apply in every case. Id.

Herring's argument is that Reardon's description of an AAG III's duties as alleged in the Complaint (¶¶ 62(a)-(i), 63) pleads her out of court. It is true that those paragraphs can be construed as imbuing the AAG IIIs in Reardon's section with substantial responsibilities. Those paragraphs also create the

34

impression that Reardon had some measure of discretion in the discharge of her duties. But the tasks of investigating crimes, prosecuting cases, advising administrative agencies on legal issues, answering questions from citizens and law enforcement agencies, reviewing pending legislation, making recommendations to the Attorney General, and drafting opinions do not per force plead that an AAG III has "extensive decisionmaking authority." To the contrary, it is reasonable to infer that Reardon's position, though somewhat expansively described in the Complaint, is that of a line attorney with little, if any, discretionary powers involving the formulation or implementation of policy.

To be sure, the giving of legal advice involves decisionmaking about what the law is and what it allows and does not allow or require. And, being a lawyer involves considerable discretion in how to investigate and try cases. But that is not the sort of decisionmaking power or discretion that is envisioned by the "employee" exception. Moreover, the description of Reardon's role pleaded in the Complaint does not permit the inference that she formulated policy while discharging the duties therein described.

Ultimately, however, the question is not whether Reardon herself formulated policy, but whether the "responsibilities and powers inherent in [her] position" as AAG III satisfy the Eighth

35

Circuit's standard. Kelley, 542 F.3d at 810. On that score, the allegations in the Complaint lead to the inference that a somewhat complex hierarchy exists within the OAG, and that some AAGs may be "on the policymaking level" and some may not. Accordingly, the Complaint implicates the existence of factual issues that must be developed in discovery as to the applicability of the policymaking level exception.

Therefore, at this stage of litigation, the Court cannot determine whether Reardon was an appointee "on the policymaking level" as a matter of law. This is not a case where "the duties and responsibilities of [an AAG III] are clearly defined by law and regulations" so that the Court "may resolve this issue without the aid of a finder of fact." Vargas-Harrison, 272 F.3d at 972. Herring has cited no statute, regulation, ordinance, or evidence clearly indicating that an AAG III such as Reardon is or is not "entrusted with extensive decisionmaking authority and discretionary power[.]"

In sum, it is simply too early to tell whether Reardon qualifies as an "employee" for purposes of the EPA. That determination is fact-intensive and better suited to resolution after the parties have conducted discovery. Therefore, the motion to dismiss will be denied to the extent that it is based on the exception set out in 29 U.S.C. § 203(e)(2)(C)(ii)(III).

## C. Reardon Has Adequately Stated a Claim for Discrimination under the EPA.

In Count I of the Complaint, Reardon alleges that she was paid less than her male counterparts, constituting wage discrimination on the basis of sex in violation of the EPA, 29 U.S.C. § 206(d).[13] (Compl. ¶¶ 69-77). To successfully plead a case of sex discrimination under the EPA, a plaintiff must plausibly allege: "(1) that her employer has paid different wages to employees of opposite sexes; (2) that the employees hold jobs that require equal skill, effort, and responsibility; and (3) that such jobs are performed under similar working

---

[13] 29 U.S.C. § 206(d) provides that:

> No employer having employees subject to any provisions of [the FLSA] shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex: Provided, that an employer who is paying a wage rate differential in violation of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee.

37

conditions." Maron v. Virginia Polytechnic Inst. & State Univ., 508 F. App'x 226, 232 (2013).

Herring contends that the Complaint does not adequately plead the second element of Count I because Reardon has not adequately alleged that her male comparators held jobs requiring "equal skill, effort, and responsibility." (Def. Mem. at 15-16). Herring finds particular fault because the Complaint is "devoid of any factual allegations regarding the requirements, performance, and content of the jobs of the alleged male comparators." Id. at 15. That failure, says Herring, necessitates dismissal. However, the Complaint, fairly interpreted, with all inferences drawn in Reardon's favor, disproves Herring's argument.

Reardon has alleged that she was paid substantially less than each of the five male AAG IIIs in her section. (Compl. ¶¶ 53-58). From the allegations in the Complaint, it reasonably can be inferred that Reardon and the identified male attorneys perform their jobs under similar working conditions in that Reardon and the identified male attorneys work in the same department. Id. Therefore, the Court need decide only whether Reardon has adequately alleged that her male comparators held jobs requiring "equal skill, effort, and responsibility."

Although § 206(d) speaks of jobs requiring "equal skill, effort, and responsibility" (emphasis added), "application of the Equal Pay Act is not restricted to identical work." Earl v. Norfolk State Univ., 2014 WL 2916718, at *15 (E.D. Va. June 26, 2014) (citing Brennan v. Prince William Hosp. Corp., 503 F.2d 282, 291 (4th Cir. 1974)). Rather, the jobs need only be "substantially equal." Brennan, 503 F.2d at 290. "The crucial finding on the equal work issue is whether the jobs to be compared have a 'common core' of tasks, i.e., whether a significant portion of the two jobs is identical." Brewster, 788 F.2d at 991 (quoting Brobst v. Columbus Servs. Int'l, 761 F.2d 148, 156 (3d Cir. 1985)). If the jobs share a "'common core' of tasks," the "inquiry then turns to whether the differing or additional tasks make the work substantially different." Id. Importantly, "[j]ob descriptions and titles...are not decisive. Actual job requirements and performance are controlling." Brennan, 503 F.2d at 288. In sum, the plaintiff must "show that the comparison she is making is an appropriate one." Strag v. Bd. of Trustees, 55 F.3d 943, 950 (4th Cir. 1995).

The requisite specificity for this element of an EPA is illustrated by several recent cases in this district. For example, the Court has previously allowed an action to proceed, over a Rule 12(b)(6) challenge, where the plaintiff, a college

39

professor, alleged that he and his comparators taught "the same" or "fungible" courses, and there was no indication to the contrary, the EPA claim was allowed to proceed. Earl v. Norfolk State Univ., 2014 WL 2916718, at *4 (E.D. Va. June 26, 2014). Earlier this year, in Taylor v. Millennium Corp., the Court denied a motion to dismiss an EPA discrimination claim because the plaintiff had "allege[d] that she performed similar work to [her comparator] and that their jobs required the same skill, effort, and responsibility," even though the Complaint also alleged that she and her comparators "reported to different supervisors and that they supervised different employees." 2016 WL 927185, at *10 (E.D. Va. Mar. 4, 2016). The Court decided that the motion to dismiss stage "[was] too soon to rule on" whether the responsibilities of the plaintiff and her comparators were adequately equal. Id. Even more recently, the Court held that a plaintiff had satisfied this element by pleading "that the people who have the same job title as him, who work in the same department, who have the same qualifications, and who do the same work as him are paid differently than he is." Hinton v. Virginia Union Univ., -- F. Supp. 3d --, 2016 WL 2621967, at *26 (E.D. Va. May 4, 2016); see also Merchant v. Prince George's Cty., 2010 WL 503046, at *5 (D. Md. Feb. 9, 2010).

Those decisions demonstrate that where, as here, a
plaintiff alleges that the opposite sex comparators performed
substantially similar work, received identical classification,
and had comparable work experience, the complaint has adequately
alleged the second element of a discrimination claim under the
EPA. In the Complaint, Reardon identifies five male
comparators, all of whom were AAG IIIs within Reardon's section
at the OAG, Major Crimes and Emerging Threats. (Compl. ¶¶ 52-
57). At least two of Reardon's male comparators were also based
in Richmond. Id. ¶¶ 55, 57. The Complaint also sets forth the
number of years of bar experience for each male comparator,
ranging from 13 to 21 years. Id. ¶¶ 53-57. Reardon, admitted
to the Virginia State Bar in 1984, has bar experience greater
than or equal to each of the male comparators identified. Id. ¶
18.[14] Reardon also alleges that attorney classification and

---

[14] Herring repeatedly contends that Reardon did not possess the
same skills as her male comparators because, "despite being
admitted to the bar in 1984, at the time her employment was
terminated, Plaintiff had only actively practiced law for twelve
and one half (12.5) years[, and] the alleged male comparators
identified by Plaintiff had at least thirteen (13) years of
experience." (Def. Mem. at 16). Although Reardon admits in the
Complaint that she practiced law only from 1984 to 1988 and from
April 2006 to the present, the Complaint contains no allegations
concerning the number of years the other AAG IIIs in Reardon's
section had actually practiced law. Rather, the Complaint
contends only that Reardon had been admitted to the bar for at
least as many years as each of her male comparators. Therefore,
at this early stage, the Court declines to consider Herring's

salary within the OAG depends heavily on attorneys' years of bar
experience.  Id. ¶ 24-25.  Finally, the Complaint alleges that
the male attorneys in Reardon's section had similar duties and
performed similar work.  Id. ¶¶ 63, 71.  These allegations
satisfy the second element of the EPA claim raised in Count I.

The authority cited by Herring does not show otherwise.
Citing Wheatley v. Wicomico Cty., Maryland, 390 F.3d 328 (4th
Cir. 2004), Herring argues that plaintiffs must provide detailed
facts concerning comparators' tasks and responsibilities.
However, Wheatley was decided on a complete factual record, and
the case was before the Court of Appeals on a motion for
judgment as a matter of law, not a motion to dismiss.  In fact,
every case cited in Herring's brief in support of the motion to
dismiss Count I was decided after discovery had been completed,
either on summary judgment or at a jury trial.  The higher level
of factual specificity demanded of the plaintiffs in those cases
is the sort of detail most appropriately developed through
discovery.  Requiring such comprehensive factual detail at this
stage would be contrary to Fed. R. Civ. P. 8's requirement of "a
short and plain statement of the claim showing that the pleader
is entitled to relief."  Similarly, Twombly and Iqbal require
only that the plaintiff plead facts sufficient to support an

argument concerning Reardon's male comparators' years of
practice experience, as opposed to "bar experience," because
that argument relies on facts beyond the scope of the Complaint.

inference that the plaintiff's claim to relief is plausible to justify unlocking the doors of discovery.

For the foregoing reasons, the allegations in the Complaint are sufficient to infer that Reardon and the male attorneys in her section had "substantially equal" duties and responsibilities. Reardon has pled sufficient facts to merit allowing the parties to gather concrete evidence on the relevant aspects of the employees' positions. Accordingly, the motion to dismiss will be denied as to Count I.

### D. Reardon Has Not Stated a Retaliation Claim under the EPA.

The EPA, as incorporated into the FLSA,[15] provides that it is unlawful "to discharge or in any other manner discriminate against an employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter..." 29 U.S.C. § 215(a)(3). Thus, to state a claim for retaliation, a plaintiff must plausibly allege that: "(1) engagement in protected activity, (2) 'materially adverse action...which...might well have dissuaded a reasonable worker from making or supporting a charge of discrimination,' and (3) causality."[16] Hinton, 2016 WL

---

[15] O'Neill v. Allendale Mut. Ins. Co., 956 F. Supp. 661, 665 n.8 (E.D. Va. 1997) (noting that the "Equal Pay Act...directly incorporates § 215(a)(3) of the FLSA.").

[16] To establish a claim for retaliation under the FLSA, a plaintiff may offer direct evidence that she was retaliated

43

2621967, at *17 (quoting Burlington N. & Santa Fe Rwy. v. White, 548 U.S. 53, 68 (2006)); Darveau v. Detecon, Inc., 515 F.3d 334, 340 (4th Cir. 2008).

Herring concedes for purposes of this motion that Reardon's termination constituted qualifying adverse action, but he contends that she has not adequately alleged either the first or third elements of an EPA claim. (Def. Mem. at 17-22). Therefore, the Court addresses each of those elements in turn.

### 1. Reardon Adequately Alleged that She Engaged in Protected Activity

Herring first contends that Reardon has not alleged that she engaged in protected activity because Reardon never "informed Ms. Bryant, Mr. Jagels, or anyone else that she thought the EPA was being violated, or that she believed she was being discriminated against on the basis of her gender." (Def. Mem. at 20). Therefore, says Herring, "Plaintiff's alleged complaints failed to provide...fair notice that she believed she was being discriminated against under the EPA." Id. Thus, it is necessary to determine whether Reardon's alleged discussions

---

against because she engaged in protected activity, or apply the "burdenshifting" scheme initially articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973), which requires that a plaintiff plead a prima facie case. Hackney v. Arlington Cty. Police Dept., 145 F.3d 1324, 1998 WL 230849, at *4 (4th Cir. May 11, 1998). Because Reardon has alleged no facts that would permit a finding that she has pled a "direct" case, she must plead each of the elements of a prima facie case, as set forth herein.

with her supervisors concerning the disparity between her salary and her male coworkers' salaries constitute "protected activity" within the meaning of 29 U.S.C. § 215(a)(3).

As Reardon correctly points out, an intracompany complaint, either written or oral, may suffice to satisfy this requirement. Minor v. Bostwick Labs., Inc., 669 F.3d 428, 438 (4th Cir. 2012). Moreover, contrary to Herring's premise, an employee need not invoke the statute by name or "employ any magic words, such as 'discrimination,' for 'the communication of a complaint of unlawful discrimination...may be inferred or implied' from the surrounding facts." Mazloum v. Dist. of Columbia, 442 F. Supp. 2d 1, 13 (D.D.C. 2006) (internal citations omitted, emphasis in original).

On the other hand, an employee simply "letting off steam" does not constitute protected activity. Kasten v. Saint-Gobain Performance Plastics Corp., 563 U.S. 1, 14 (2011). Therefore, "some degree of formality" is required for an employee complaint to constitute protected activity, "certainly to the point where the recipient has been given fair notice that a grievance has been lodged and does, or should, reasonably understand that matter as part of its business concerns." Id. In other words, "to fall within the scope of the antiretaliation provision, a complaint must be sufficiently clear and detailed for a reasonable employer to understand it, in light of both content

45

and context, as an assertion of rights protected by the statute and a call for their protection." Id.

Reardon's Complaint satisfies that standard. Reardon alleges that, in "late 2014, Plaintiff complained to Michael Jagels, employed by the OAG as a supervisor of Plaintiff's section at the OAG, and Mr. Dorgan [Reardon's section chief] about being paid below the matrix guidelines and/or other male attorneys at the OAG." (Compl. ¶ 39). In "early 2015, Reardon again complained numerous times to Mr. Jagels and Ms. Bryant about being paid below the matrix guidelines and/or other male attorneys at the OAG." Id. ¶ 42. Notwithstanding these complaints, Reardon's salary continued to lag far behind the salaries of the male attorneys in her section. Id. ¶¶ 52-58. In sum, Reardon "repeatedly complained to her supervisors at the OAG that she was paid less than male attorneys at the OAG." Id. ¶ 79.

Construing these allegations in the light most favorable to Reardon, the facts alleged permit the inference that Herring was on notice of Reardon's belief that the discrepancy between her salary and her male coworkers' salaries was because of her sex. Reardon's allegations that she complained of being paid less than her male coworkers satisfy the pleading threshold required for the first element of an EPA claim for retaliation under the

EPA.[17] See, e.g., E.E.O.C. v. White & Son Enters., 881 F.2d 1006, 1011 (11th Cir. 1989) (plaintiffs had satisfied this element when they had complained to supervisors about unequal pay and asked for a raise equivalent to a raise received by male employee); Prosser v. Thiele Kaolin Co., -- F. Supp. 3d --, 2015 WL 5769233, at *11 (M.D. Ga. Sept. 30, 2015) (plaintiff satisfied this element by complaining that "her 'pay is lower than the guys' is,'" even though she "did not use the words 'equal pay act' or 'gender-based wage differential'"); Wildi v. Alle-Kiski Med. Ctr., 659 F. Supp. 2d 640, 664 (W.D. Pa. 2009) (denying defendant's motion for summary judgment where employee "expressed to [her employer] her belief that there was an unfair wage disparity, and...testified at her deposition that she specifically complained that one of the problems with the disparity was that all her counterparts were male.").

---

[17] The Court agrees with Herring that, standing alone, Reardon's alleged complaints to her supervisors in 2011 and "early 2014" (Compl. ¶¶ 29, 36-37) that her salary was below the matrix guidelines fail to qualify as protected activity under the EPA because there is no indication that Reardon's complaints at those times raised the issue of the correlation between salary discrepancy and gender. However, those facts, if proved, may help provide context for the later allegations of gender-biased discrimination. And, discovery may supply further context for these allegations.

## 2. Reardon Has Not Sufficiently Stated a Causal Link

Next, the analysis proceeds to whether Reardon has adequately alleged a causal connection between her complaints in "late 2014" and "early 2015" and her termination on June 15, 2015. As explained below, she has not.

To state a claim for retaliation, a plaintiff must plead a causal link between the protected activity and the adverse action.[18] A "causal link" requires that the employer knew of the protected activity and that "either the retaliation must closely follow the protected activity or the plaintiff must put forth a sufficient explanation for the time elapsed between the protected activity and the alleged retaliation." Hinton, 2016 WL 2621967, at *23.

---

[18] The Supreme Court has held that Title VII retaliation claims "must be proved according to traditional principles of but-for causation...[which] requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." Univ. of Texas Sw. Med. Ctr. v. Nassar, -- U.S. --, 133 S. Ct. 2517, 2533 (2013). The Fourth Circuit has not yet spoken on the application of Nassar to retaliation claims brought under the EPA or the FLSA. However, as a sister district court has noted, regardless of whether the plaintiff must ultimately prove but-for causation at trial, at the motion to dismiss stage, a plaintiff faces a "less onerous burden" of alleging a prima facie case of causality. Martinez v. K & S Mgmt. Servs., 2016 WL 808797, at *8 (D. Md. Mar. 2, 2016) (internal citation omitted). Therefore, the Court need not determine whether the rule announced in Nassar applies to Reardon's retaliation claim.

Where causation is based on temporal proximity alone, the retaliatory action must be "very close" in time to the protected activity to support a <u>prima facie</u> case.  <u>Clark Cty. Sch. Dist. v. Breeden</u>, 532 U.S. 268, 273 (2001) (stating that actions taken 20 months after the protected activity do not, without more, suggest causality, and noting that 3-4 months has been found insufficient).  Although there is no "bright temporal line," the Fourth Circuit has held that a period of three to four months between the protected activity and the adverse employment action is too long to establish causation by temporal proximity alone, and "[e]ven a mere ten-week separation between the protected activity and termination 'is sufficiently long so as to weaken significantly the inference of causation between the two events.'"  <u>Perry v. Kappos</u>, 489 F. App'x 637, 643 (4th Cir. 2012) (quoting <u>King v. Rumsfeld</u>, 328 F.3d 145, 151 n.5 (4th Cir. 2003)).  Although <u>King</u> accurately reflects the Fourth Circuit's skepticism of causal connection where temporal proximity is lacking, other decisions have held that, even in the face of a lengthy passage of time, other evidence of retaliation may suffice to show a causal connection.  <u>See</u> <u>Lettieri v. Equant Inc.</u>, 478 F.3d 640, 650 (4th Cir. 2007); <u>Causey v. Balog</u>, 162 F.3d 795, 803 (4th Cir. 1998).

> In the absence of temporal proximity, courts consider other circumstances when determining if a plaintiff has pled a prima facie case. Most frequently, courts look to ongoing retaliatory animus or intervening antagonism during the period between the protected activity and the adverse action in order to find a causal connection where there is a lack of temporal proximity...These cases tend to involve regular acts showing animus or antagonism, coupled with valid reasons why the adverse action was not taken immediately. For example, in Lettieri, the Fourth Circuit found a causal connection where the defendants discussed ways to fire the plaintiff and stripped her of a significant portion of her job responsibilities shortly after she filed a complaint, which enabled her employer to terminate her employment five months later based on the redundancy of her reconstituted role.

Hart v. Hanover Cty. Sch. Bd., 2013 WL 1867388, at *5 (E.D. Va. May 2, 2013), aff'd, 547 F. App'x 298 (4th Cir. 2013).

The Complaint does not state specifically the duration between Reardon's complaints in "early 2015" and her termination on June 15, 2015, but Reardon argues that "'early 2015' is certainly within several months or approximately four months from June 15, 2015." (Pl. Mem. at 26). Nonetheless, at least five and one-half months elapsed between Reardon's first complaints of pay discrimination in "late 2014" and her termination. Even drawing all reasonable inferences in Reardon's favor, at least ten weeks, and quite possibly more, elapsed between the "early 2015" complaints and her termination.

Here, Reardon's allegations concerning the chronology of her protected activity are so vague that the Court is unable to confidently determine whether temporal proximity might support an inference of causation. The Fourth Circuit has noted that "a lapse of two months between the protected activity and the adverse action is 'sufficiently long so as to weaken significantly the inference of causation.'" Horne v. Reznick Fedder & Silverman, 154 F. App'x 361, 364 (4th Cir. 2005) (quoting King, 328 F.3d 145, 151 n.5). And, as noted above, it seems likely that Reardon's termination on June 15, 2015 was, at best, ten weeks later than her complaints in "early 2015," if not more. Furthermore, Reardon has made no allegations of retaliatory animus or intervening antagonism occurring in the period between "late 2014" and her termination. Even drawing all reasonable inferences in favor of Reardon, the Court is unable to infer from the pleaded facts in the Complaint a causal relationship from these sparse and vague allegations.

In her opposition brief, Reardon makes much of the fact that she received a positive performance evaluation in November 2014. (Pl. Mem. at 24-26). Reardon appears to contend that the Court can infer from this positive evaluation that there could be no non-retaliatory motive for her termination. However, receipt of a positive evaluation after the plaintiff has engaged in protected activity is "antithetical to a claim of retaliation

51

and [tends] to break the causal chain." Jones v. Dole Food Co., 827 F. Supp. 2d 532, 554 (W.D.N.C. 2011). And, it is impossible to tell whether Reardon's positive performance evaluation cuts in favor of a finding of causation or not, because the Court is unable to discern from the Complaint whether Reardon received her positive evaluation before or after she first complained in "late 2014" that she was receiving unequal wages because of her sex. Therefore, because Reardon has failed to allege facts from which the Court can discern the sequence of events leading up to her termination, Reardon's allegations concerning her performance fail to support an inference of causation.

In sum, the absence of specific dates on which Reardon engaged in protected activity, combined with the absence of any allegations to support an inference of antagonistic actions or retaliatory animus, makes it impossible for the Court, even drawing all reasonable inferences in Reardon's favor from the facts as alleged, to find that Reardon has adequately alleged that the termination of her employment was causally related to her protected activity in "late 2014" and "early 2015." Therefore, Count II will be dismissed without prejudice and with leave to amend.

## CONCLUSION

For the reasons, and to the extent, set forth above, DEFENDANTS' MOTION TO DISMISS (ECF No. 5) will be granted in part and denied in part. The motion to dismiss the Office of the Attorney General as a defendant will be granted as to both Counts. The motion to dismiss Count I against Herring will be denied. The motion to dismiss Count II against Herring will be granted. Reardon will be given leave to file an Amended Complaint, and may replead Count II if there are facts to support pleading a legally sufficient causal link.

It is so ORDERED.

_____/s/_____

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date:   June 3, 2016